UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| Kenneth and Angela Metcalf, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 09-CV-14 CAS |
| | ) | |
| Lowe's Home Centers, Inc., | ) | |
| The Quikrete Companies, Inc. and | ) | |
| The Valspar Corporation; | ) | |
| | ) | |
| Defendants. | ) | |

**VALSPAR CORPORATION'S AND QUIKRETE COMPANIES INC.'S MOTION TO EXCLUDE REPORT AND TESTIMONY OF DR. F. DAVID SCHNEIDER, AND MEMORANDUM OF LAW IN SUPPORT THEREOF**

Defendants The Valspar Corporation and The Quikrete Companies, Inc. ("Defendants"), pursuant to Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell-Dow Pharmaceuticals*, 509 U.S. 579 (1993), move to exclude the opinion of Dr. F. David Schneider.  In support of this motion, Defendants submit the following memorandum.

**INTRODUCTION**

Plaintiffs Angela Metcalf ("Angela") and her husband Kenneth ("Kenneth") claim to have been injured by inhaling the fumes of a concrete sealer they applied in the unventilated basement of their home in November 2008.  Kenneth applied this sealer for approximately 45 minutes, and Angela for 15 minutes.  They fled the house, returning only once to collect some belongings.  They now seek damages for alleged physical injuries, severe emotional distress and mental anguish, and claim that their home is unlivable and should be demolished.

F. David Schneider, MD ("Dr. Schneider"), who first saw plaintiffs after they filed this suit and more than nine weeks after the alleged exposure, should have diagnosed both plaintiffs

with exposure to toxic chemical "based on history".  Schneider observed no objective evidence of exposure in either plaintiff, but proposes to testify as an expert witness in spite of the fact that he has no experience in this area of medicine.

Dr. Schneider diagnosed Angela with Multiple Chemical Sensitivity ("MCS"), a speculative, unproven theory of disease that is not recognized or accepted by the medical or scientific communities and which has never been held admissible in any federal court.  Dr. Schneider admits he had never made such a diagnosis before.  He admits it is a diagnosis that is controversial, in which he has no experience or expertise, for which he had to rely on a phone consultation with a Texas physician to make, and for which he used a self-reporting questionnaire he had never used before and later lost.  Schneider also admitted that Angela has actually not reported any of the symptoms normally associated with MCS by those who believe it actually is a disease entity.

Dr. Schneider's diagnoses and opinions must be excluded.  They fail to meet the requirements for admissibility under *Daubert* because:  He is not qualified to render these opinions.  His methodology was unreliable.  He lacked sufficient reliable data.  He failed to perform a proper differential diagnosis and relied upon a temporal association to make a diagnosis..

Schneider failed to scientifically determine that the alleged exposure could be a possible cause of plaintiffs' alleged injuries.  He does not know what level of exposure to the product would be necessary to cause an appreciable risk of injury.  He performed no tests to evaluate for effects of exposure, and he did not visit the plaintiffs' home or conduct any environmental testing (in fact only defendant has conducted any environmental testing).  He had no reliable

grounds to determine whether plaintiffs were exposed to a sufficient amount of any chemical in the product to cause any injuries.

Dr. Schneider failed to properly rule out other causes of plaintiffs' alleged injuries. Angela has an extensive pre-existing history of anxiety disorders and depression.  Dr. Schneider agrees that he failed to rule out these pre-existing anxiety disorders as a cause of her alleged injuries; he believes that she continues to suffer from panic disorder and that her reportedly severe reaction to the product was caused (at least in part) by her panic disorder.

The *sole* basis for each of Schneider's diagnoses was the temporal proximity of the plaintiffs' alleged symptoms to the time of the alleged exposure.  Having seen plaintiffs more than nine weeks after the alleged exposure, such a basis is insufficient by medical methodological standards, and under *Daubert*.  He cannot reliably extrapolate from the objective data, because the gap between the objective data and his opinions is too great.  In sum, all of Dr. Schneider's proposed testimony should be stricken and excluded from evidence because it fails to meet the requirements of Rule 702 and *Daubert*.

## RELEVANT FACTUAL BACKGROUND

Plaintiffs claim that on or about November 16, 2008, they applied Quikrete Multi-Surface Concrete Sealer to the concrete floor in two completely unventilated rooms in their basement. Plaintiffs allege that they "were overcome by the fumes from the product and were forced to vacate their home".  *See* First Amended Complaint (doc. 42) ¶ 14.  Plaintiffs claim that they have been unable to live in their home since the incident. *Id*. at ¶ 15.  In deposition, plaintiffs testified that they will never return to the home because they ***believe*** it is a permanent health hazard.  *See* Transcript of Deposition of Angela Metcalf, attached as **Exhibit A**, p. 220, l. 17 – p. 222, l. 13; Transcript of Deposition of Kenneth Metcalf, attached as **Exhibit B**, p. 66, l. 24 – p. 68, l. 10.  In addition to

compensation for medical bills and pain and suffering, they are seeking the full fair market value (and $40,000 worth of improvements) of the house, "pre-incident," as damages for a total of some $200,000.[1]

Angela claims to have experienced severe symptomology following her 15 minute exposure. **Exhibit A**, at p. 63, ll. 16-23, p. 65, ll. 7-8.  Despite these alleged severe symptoms, Angela did not seek emergency medical care.  *Id.*, p. 65, ll. 15-18.  Instead, plaintiffs left the house and drove to Wal-Mart to develop some photos and ate dinner at Chinese Buffet Restaurant.  *Id.* at p. 65, ll. 19-21; p. 57 l. 21 – p. 58, l. 16.  Plaintiffs then drove to Angela's parents' house in Bethalto, Illinois, where they spent the night.  *Id.* at p. 59, ll. 17-23.

Angela testified that the morning after the incident most of her alleged symptoms had resided.  *Id.* at p. 66, ll. 8-13.  She alleges that upon return to the home she experienced symptoms again, including swollen eyes, trouble breathing, nausea and anxiety.  *Id.* at p. 75, l. 18 – p. 77, l. 9.  Angela admitted that she was not sure whether her symptoms were psychosomatic and induced by anxiety or were really caused by the product, saying "I don't know if the smell itself made me have those feelings or reminded me of what I felt like when I was around the product."  *See id.* at p. 75 l. 25 – p. 76, l. 1, p. 78, ll. 4-8.  This was the last time Angela Metcalf was in her home.

Kenneth complained of transient lightheadedness and "a tingling sensation in [his] feet." **Exhibit B**, p 31, ll. 17-20.  Those symptoms lasted about twenty minutes.  *Id.* at p. 32, ll. 20-23.  About an hour after using the sealer, he felt well enough to drive.  *Id.* at p. 34 ll. 9-20.  He did not feel like he needed medical attention.  *Id.*

Plaintiffs first sought medical attention on November 22, 2008, one week after the incident, from Dr. Sivasankara Konala at Maryland Heights Urgent Care.  Dr. Konala testified that neither

---

[1] Just to reiterate:  neither Dr. Schneider, nor any of plaintiffs' experts, is offering any opinion that the home is either uninhabitable or a health hazard.

plaintiff had any objective symptomotology at the time he examined them (i.e., it appeared absolutely nothing was wrong with plaintiffs). *See* Deposition of Sivasankara Konala, MD, attached as **Exhibit C**.  Angela admitted that, at the time she went to Dr. Konala, she was not sure whether her alleged symptoms were caused by the exposure or simply by her own anxiety. *See* **Exhibit A**, at p. 89, l. 14 – p. 90, l. 4.

Plaintiffs filed this suit on January 6, 2009.  A week later, on January 13, 2009 (nine weeks and one day after the alleged incident) Plaintiffs went to Dr. Schneider.  (apparently Angela did not think her uncle and primary care physician, Dr. Zimmerman was capable of caring for this problem. Which is probably why she failed to mention it at her office visit on December 19, 2008 after seeing Dr. Konala and prior to seeing Dr. Schneider).  *See* December 19, 2008 medical record of Dr. Zimmerman.  *See* Report of Dr. Schneider, **Exhibit D**, p. 1.  Angela claims that, at that time, she had "occasional" breathing problems, but admits that mostly she just had a lot of anxiety. **Exhibit A** at p. 97, ll. 12-25.

When Dr. Schneider examined Angela, he did not find any breathing problems.  Deposition of Dr. F. David Schneider, **Exhibit E,** at p. 61 l. 23 – p. 63 l. 8.  He noted that she was anxious; her symptoms and behavior were consistent with panic disorder.  *Id*. at p. 54, ll. 10-12.  Angela in fact reported to Dr. Schneider that she had a history of agoraphobia with panic attacks, anorexia, depression and irritable bowel syndrome ("IBS").  *See* **Exhibit E**, p. 52, l. 19 – p. 56, l. 8, and Exhibit N to Deposition (Angela's Medical Records).

Dr. Schneider did not perform any tests to evaluate for effects of the exposure. *Id*. at p. 61 ll. 17–24.  Instead, he relied on an obscure tool titled The Quick Environmental Exposure and Sensitivity Inventory ("QEESI"), a self-reporting questionnaire that Angela completed. *Id*., p. 31, l. 20 – p. 33, l. 23.  Dr. Schneider had no experience with the QEESI, yet he interpreted the results

5

himself. *Id*. p. 72, l. 3 – p.73, l. 2. Unfortunately, the actual results of this QEESI are unknown because it has mysteriously disappeared. *Id*. p. 32, l. 14-16. *For this reason alone his opinion should be striken.*

Relying only on Angela's self-reported history and the temporal proximity of those claimed symptoms to the alleged exposure, Dr. Schneider diagnosed Angela with MCS, even though he did not observe any symptomology of this "syndrome". *Id*. at p. 60, ll. 4-24; p. 77 l. 22 – p. 78, l. 4. Despite her report of pre-existing anxiety disorders, he did not rule out as other somatization disorder, histrionic disorder or panic disorder as other possible causes of her problem, *Id*. at p. 59, ll. 10-20; p. 83 l. 23 – p. 84, l. 11.

Dr. Schneider testified that Angela does have panic disorder. *Id*. at p. 59, ll. 10-20. He admitted that Angela most likely had a panic attack during the incident, and her allegedly severe reaction was caused by her pre-existing panic disorder, not the product. *See id*. at p. 68, l. 6 – p. 69, l. 10, p. 81, l. 10 – p. 82, l. 1. Dr. Schneider further admitted that Angela's reported symptoms could possibly have been caused by somatization disorder, an anxiety disorder that involves physical complaints with an emotional, not a physical, cause. *Id*. at p. 59, ll. 2-12, p. 83, l. 23 – p. 84, l. 11.

With respect to Kenneth, Dr. Schneider found no objective evidence of the alleged exposure. *Id*. at p. 41, l. 20 – p. 42, l. 6. In fact, Dr. Schneider is not attributing any objective symptomology in Kenneth to the alleged exposure; his "diagnosis" is that Kenneth experienced the symptoms that Kenneth claims to have experienced, based on nothing but Kenneth reporting them. *See id*. at p. 45, l. 8 – p. 46, l. 7; p. 47, ll. 17-24. Indeed, his diagnosis for both plaintiffs of "exposure to toxic chemical" is based on nothing but the report they made to him nine weeks after the fact and while engaged in litigation. *Id*. at p. 90, ll. 15-25.

Regarding his qualifications, Dr. Schneider freely admits he is not an expert on MCS[2]. *Id*. at p. 20, ll. 23 – p. 21, l. 1.  He had to rely on a phone consultation with a Dr. Claudia Miller in San Antonio to make the diagnosis.  *See id*. at pp. 10-13.  This was Schneider's first and only MCS diagnosis.  *Id*. at p. 12, ll. 5-21, p. 70, ll. 9-14.  Dr. Schneider has not treated anyone for exposure to Xylene, Toluene, Ethyl Benzene or Mineral Spirits which are the volatile organic compounds in the product.  *Id*. at p. 80, ll. 2-15.

Dr. Schneider admitted that his diagnoses were not based on objective data.  He did not visit the Plaintiffs' home or conduct any air sampling studies of the house.  *Id*. at p. 50, l. 24 – p. 51, l. 3.  He does not know how long plaintiffs were exposed to the fumes.  *Id*. at p. 78, ll. 5-10.  He does not know to what chemical plaintiffs allegedly had a reaction.  *Id*. at p. 78, ll. 14-21.  He does not know what level of exposure would cause a reaction.  *Id*. at p. 78, l. 25 – p. 79, l. 3.  He does not know what the Permissible Exposure Levels (PEL) or Threshold Limit Values (TLV) are for the chemicals in the product (in fact he has no knowledge of, and has had no experience with, PELs or TLVs), and is unable to testify whether plaintiffs' alleged exposure exceeded the PEL or TLV for the chemicals in the product.  *Id*. at p. 79, l. 4 – p. 80, l. 1.  Indeed, Dr. Schneider admits that his diagnoses were based on nothing more than plaintiffs' story of the incident.  *Id*. at p. 90, ll. 20-25.  While it appears that Schneider has backed off of his opinion of MCS and will only testify that this preexisting anxiety disorder was exacerbated by product exposure, even that opinion fails under *Daubert*.  In fact had Schneider been functioning as he should have (as a treating doctor), and ordered Angela Metcalf's past medical records from Dr. Zimmerman he would have seen that she had the same

---

[2] Dr. Schneider also admits that MCS is a highly controversial diagnosis. *Id*., p. 70, ll. 15-18.  When asked to name one medical association, such as the American Medical Association or the Academy of Allergy and Immunology, that recognizes MCS as a valid diagnosis, his reply was **"I don't know.  I'm not an expert in this area."** *Id*. at p. 70, l. 19 – p. 71, l. 15.

physical and psychiatric complaints since about age 10. *See* deposition of Dr. Zimmerman, **Exhibit G,** at p. 23 l. 17 – 21, p. 24 l. 1.

## ARGUMENT

**I.      LEGAL STANDARD FOR ADMISSIBILITY**

District courts are charged with ensuring that all scientific testimony is both reliable and relevant. *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 757 (8th Cir. 2006). Proposed expert testimony must meet three prerequisites to be admissible under Rule 702: (1) the evidence of specialized knowledge must be useful to the trier of fact, i.e., it must be relevant; (2) the proposed witness must be qualified to give expert testimony in a particular field; and (3) the expert's opinion must be reliable in that the expert used reliable principles and methodology in arriving at the opinion. *Lauzon v. Senco Products, Inc.*, 270 F. 3d 681, 686 (8th Cir. 2001).

The party proposing the expert testimony must show by a preponderance of the evidence that the expert is qualified to render an opinion and the methodology underlying the conclusions is scientifically valid. *Daubert*, 503 U.S. at 589-90. "When proposed expert testimony is scientific in nature, the trial judge must make a 'preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue.'" *Id*. at 592-93. The Court should examine: (1) whether the theory or technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or technique has obtained general acceptance within the community. *Id*.

In addition, to satisfy *Daubert*, a medical opinion on causation must be based on a proper differential diagnosis. *Bland v. Verizon Wireless, (VAW) L.L.C.*, 538 F.3d 893, 897 (8th Cir. 2008) (quoting *Turner v. Iowa Fire Equip. Co.*, 229 F.3d 1202, 1208 (8th. Cir. 2000)). To conduct a

proper differential diagnosis an expert must rule in all scientifically possible causes and then scientifically rule out the least possible causes until the most probable cause is isolated. *Id*. at 897-98; *see also* Judge Webber's well-reasoned and oft-cited opinion in *Glastetter v. Novartis Phar. Corp.*, 252 F.3d 986, 989 (8th Cir. 2001). Where a doctor fails to scientifically eliminate other possible causes, the diagnosis fails to satisfy *Daubert*. *Id*. at 898; *see also Turner*, 229 F.3d at 1206 (affirming the exclusion of a doctor where he failed to consider whether other factors may have caused or contributed the plaintiff's problems).

## II.     DR. SCHNEIDER SHOULD BE EXCLUDED BECAUSE HIS OPINIONS FAIL TO MEET THE THRESHOLD FOR SCIENTIFIC RELIABILITY

Here, Dr. Schneider's testimony should be excluded because it fails to pass the *Daubert* test in several respects. He is not qualified as an expert on the toxicity of the chemicals in the product in fact he has never examined or treated anyone exposed to these chemicals. Dr. Schneider lacked sufficient reliable data and failed to perform a proper differential diagnosis; instead the diagnoses are based solely on plaintiffs' subjective self-reported symptoms and the temporal proximity of those symptoms to the alleged exposure. He never even requested her past medical records, despite a 17 year psychiatric history and extensive medical history. Moreover, the MCS diagnosis is not accepted by the medical profession as a scientifically valid diagnosis, and it fails to meet the threshold reliability requirements under *Daubert*.

### A.     Dr. Schneider Is Not Qualified

Dr. Schneider is not qualified to offer opinions on toxic exposures to the chemicals in the product, or on MCS. Although Dr. Schneider is a physician, the court must adhere to its gatekeeping role to prevent witnesses who may be qualified in one area from exceeding the scope of his or her expertise. *See Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 714-16 (hydrologist qualified to testify about flood risk management, but not qualified to testify

concerning safe warehousing practices, in case by bailor steel company against bailee warehousing company for damage to bailor's steel caused by flood), and cases cited therein. The court has a duty to ensure that an expert's "testimony does not exceed the scope of the expert's expertise, which if not done can render expert testimony unreliable under Rule 702." *Id*. at 715. This is true no matter how qualified and experienced the expert is.

In *Smith v. Rasmussen*, 249 F.3d 755 (8th Cir. 2001), an "experienced, board-certified general psychiatrist who ha[d] treated several patients with sexual disorders" was excluded from testifying regarding the "effectiveness and necessity of sex reassignment surgery in general and for Smith in particular" because he "had examined only one patient with gender identity disorder, that examination occurring some eight years prior to trial in this case, and had had limited contact with that patient." *Smith*, 249 F.3d at 758.

Schneider has no experience treating patients for chemicals exposure. He does not know the level of plaintiffs' exposures, or the level that would cause an appreciable risk of injury. He admits he is not an expert on MCS, and this was the first and only time he made that diagnosis. He is not qualified to offer the proposed diagnoses and opinions.

### B.   MCS Is Not A Scientifically Valid Diagnosis

MCS is not a scientifically valid diagnosis. Every federal court that has assessed the admissibility of expert testimony on MCS under *Daubert* has found MCS inadmissible as unproven, untested, speculative, and far from achieving general acceptance in the medical community. *Snyman v. W.A. Baum Co., Inc.*, 2008 WL 5337075 (S.D.N.Y. 2008) (motion to vacate and reopen denied, 2009 WL 306505 (S.D.N.Y. 2009)); *Kropp v. Maine School Admin. Union*, 471 F.Supp.2d 175 (D. Me. 2007); *Gabbard v. Linn-Benton Housing Authority*, 219 F.Supp.2d 1130 (D. Or. 2002); *Craig v. Orkin Exterminating Co., Inc.*, 2000 WL 35593214 (S.D. Fla. 2000); *Comber v. Prologue, Inc.*,

2000 WL 1481300 (D. Md. 2000); *Anello v. Shaw Industries, Inc.*, 2000 WL 1609831 (D. Mass. 2000); *Coffey v. County of Hennepin*, 23 F.Supp.2d 1081 (D. Minn. 1998); *Coffin v. Orkin Exterminating Co. Inc.*, 20 F.Supp.2d 107 (D. Me 1998); *Zwillinger v. Garfield Slope Housing Corp.*, 1998 WL 623589 (E.D.N.Y. 1998); *Frank v. New York*, 972 F.Supp. 130 (N.D.N.Y. 1997); *Treadwell v. Dow-United Technologies*, 970 F.Supp. 974 (M.D. Ala. 1997); *Sanderson v. International Flavors and Fragrances, Inc.*, 950 F.Supp. 981 (C.D.Cal. 1996); *Hundley v. Norfolk & Western Railway Co.*, 1996 WL 41512 (N.D.Ill. 1996); *Summers v. Missouri Pacific R.R. System*, 897 F.Supp. 533 (E.D. Okla. 1995), *aff'd* 132 F.3d 599 (10th Cir. 1997); *Cavallo v. Star Enterprises*, 892 F.Supp. 756, 763-774 (E.D.Va. 1995), *aff'd* 100 F.3d 1150 (4th Cir. 1996); *Carlin v. RFE Industries, Inc.*, 1995 WL 760739 (N.D.N.Y. 1995); *Bradley v. Brown*, 852 F.Supp. 690 (N.D. Ind. 1994), *aff'd* 42 F.3d 434, 437 (7th Cir. 1994).

Defendants respectfully submit that this court should not become the first to find an MCS diagnosis admissible under *Daubert*.

### C. Dr. Schneider's Methodology Was Unreliable.

Even if Schneider was qualified to offer the proposed opinions, and if MCS was somehow a scientifically recognized disease entity, his opinions must be stricken in this case because his methodology was utterly unreliable. Dr. Schneider failed to perform a valid differential diagnosis, and his diagnoses were not based on sufficient, reliable data. He cannot, consistent with *Daubert*, testify that plaintiffs' alleged injuries were caused by the product.

The case of *Bland v. Verizon Wireless, (VAW) L.L.C.*, 538 F.3d 893, 897 (8th Cir. 2008) is on point. In *Bland*, the plaintiff brought suit for damages, claiming she ingested Freon after a Verizon Wireless employee sprayed canned air into her water bottle as a practical joke. 538 F.3d at 894. She claimed to have a coughing fit, sore throat, raspy lung sensation and a two week headache as a result of the exposure. *Id.* at 895. Five weeks after the incident, Plaintiff visited her physician

11                                                                                                                                    435974.3

complaining of shortness of breath when running; however, her lung functions were normal. *Id*. at 896.  Plaintiff's physician theorized that that "'based on the initial clinical findings, [a] strong temporal relationship between the inhalation of Freon and the occurrence of respiratory symptoms, and the subsequent response to pre-exercise treatment' . . . that [plaintiff's] exercised-induced asthma was caused by the inhalation of Freon."  *Id*.  Plaintiff sought to introduce her physician's testimony at trial to establish a causal link between the inhalation of Freon and her alleged exercise-induced asthma.  *Id*.

The Eighth Circuit upheld the exclusion of plaintiff's doctor on six grounds: (1) the doctor lacked foundation to rule in the exposure as a possible cause, and failed to scientifically eliminate other possible causes, as part of the differential diagnosis; (2) the doctor did not know what amount of exposure to Freon causes or involves an appreciable risk of causing asthma; (3) the doctor had no good grounds for determining whether the plaintiff was exposed to a sufficient dose of Freon to have caused the exercise-induced asthma or estimating the amount of Freon to which plaintiff was probably exposed; (4) the doctor could not extrapolate from the existing data because the gap between the data identified and the opinion was too great; (5) the doctor had no personal experience with treating other patients following a similar exposure; and (6) the doctor's reliance on temporal proximity, without more was insufficient to establish causation.  *Id*. at 897-99.

### i.      Dr. Schneider Failed to Perform A Proper Differential Diagnosis And Relied Only Upon A Temporal Association.

Here, like the excluded doctor in *Bland*, Dr. Schneider did not properly perform a differential diagnosis. He did not have a sufficient foundation to rule in the alleged exposure to the product as a potential cause of plaintiffs' alleged injuries, and he did not rule out other possible causes.

Dr. Schneider failed all possible causes of plaintiffs' alleged symptoms. He also failed to rule out the least plausible causes, as described by Judge Webber in *Glastetter v. Novartis Pharmaceuticals. Corp.*, 252 F.3d 986, 989 (8th Cir. 2001). He relied only on the reported temporality of symptoms. Where such temporal connection is the *only* basis for a diagnosis, there is not a sufficient foundation and the diagnosis is inadmissible. *Bland*, 538 F.3d at 899.

In another recent case, *Burke v. Bayer*, No. 08-3303 (8th Cir. Nov. 13, 2009) (**Exhibit F**) the Eighth Circuit affirmed the district court's exclusion of a treating physician's causation opinion as insufficient under *Daubert's* reliability standard, where the doctor failed to perform a proper differential diagnosis and relied solely on the temporal association of the ingestion of the drug and the plaintiff's self-reported symptoms. **Exhibit F**, at pp. 20-21, 23.

Like in *Bland* and *Burke*, Dr. Schneider's opinion is based solely on the temporal proximity of exposure to the symptoms and thus fails to satisfy *Daubert's* reliability standard. He merely relied on plaintiffs' self-reported historical symptoms, some nine weeks and one day after the alleged incident, to reach his opinion. He failed to rule out panic disorder, somatization disorder, or histrionic disorder in Angela, even though he believes Angela has panic disorder and that her alleged symptoms were likely a panic attack. This is insufficient. *Bland*, 538 F.3d at 899.

Because Dr. Schneider has failed to conduct a proper differential diagnosis by scientifically eliminating other possible causes until the product was the most likely cause, his opinions that

plaintiffs' alleged symptoms were caused by the alleged exposure do not satisfy *Daubert's* standard of reliability and must be excluded.

### ii. Dr. Schneider's Opinions Are Based Neither On Sufficient Data Nor His Personal Experience.

A medical causation opinion should be excluded if it is not based on sufficient objective data regarding A) what amount of exposure to a chemical causes, or involves an appreciable risk of causing, an injury; and B) the plaintiff's actual exposure level. *Bland*, 539 F.3d at 898. "Critical to a determination of causation is characterizing the exposure." *Id*. (quoting The Reference Manual on Scientific Evidence 472 (2d. ed. 2000)). Also, in *Turner v. Iowa Fire Equip. Co.*, 229 F.3d 1202, 1208 (8th. Cir. 2000), doctor's opinions excluded where the doctor made no direct effort to determine what caused the plaintiff's medical condition or what specific ingredient of a product could have caused the plaintiff's particular disorder.

Dr. Schneider's opinion fails for the same reasons set forth in *Bland* and *Turner.* He acknowledged that he did not know the following information: (1) the length of time the plaintiffs were allegedly exposed to any chemical fumes; (2) which particular chemical or chemicals plaintiffs allegedly had a reaction to; (3) the level of exposure necessary to cause injury; or (4) whether plaintiffs exceeded that level of exposure. Further, he did not visit the plaintiffs' home or conduct any testing to attempt to determine plaintiffs' exposure levels. The *only* information Dr. Schneider relied on was plaintiffs' own self-reporting of the symptoms they claimed to have experienced.

In a chemical exposure case, the "magnitude or concentration of an exposure should be estimated and the temporal aspects of the exposure should be determined." *Bland,* 538 F.3d at 898 (quoting The Reference Manual on Scientific Evidence). Because the doctor lacked knowledge of the crucial data points–what exposure levels would involve an appreciable risk of injury, and the plaintiff's specific exposure level–the doctor "could not extrapolate from the existing data

because…the gap between the data identified and Dr. Sprince's proffered opinion was 'simply too great an analytical gap' ... to support admissibility." *Id*.

*Bland* mirrors this case. Schneider lacked sufficient data on which to base his opinions. His opinions fail to satisfy *Daubert's* standard of reliability and must be excluded.

## CONCLUSION

For all the reasons stated herein, Dr. Schneider's report and testimony fail to satisfy the requirements of Rule 702 and *Daubert*. Accordingly, Dr. Schneider's report and testimony must be excluded.

    Respectfully submitted,

    SPENCER FANE BRITT & BROWNE LLP

    By: /s/ Deirdre C.Gallagher
    Deirdre C. Gallagher, #36043
    Michael B. Calvin, #25939
    Thomas W. Hayde, #57368
    SPENCER FANE BRITT & BROWNE
    One North Brentwood Blvd., Suite 1000
    St. Louis, MO  63105
    (314) 863-7733
    (314) 862-4656 (Fax)
    dgallagher@spencerfane.com
    mcalvin@spencerfane.com
    thayde@spencerfane.com

    *Attorneys for Defendants The Quikrete Companies, Inc. and The Valspar Corporation*

## CERTIFICATE OF SERVICE

      The undersigned counsel certifies that a true and correct copy of the foregoing was electronically filed this **19th day of January, 2010,** which filing will provide electronic notice to the following:


Neal W. Settergren
Goldstein and Price, LC
1 Memorial Drive, Suite 1000
St. Louis, MO  63102

*Attorneys for Plaintiffs*


Justin L. Assouad
Hepler Broom
800 Market, Suite 2300
St. Louis, MO 63101

*Attorneys for Defendant Lowe's Home Centers, Inc.*


                                                                                             /s/ Deirdre C. Gallagher