# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| KENNETH METCALF, et al., | ) |
| Plaintiffs, | ) ) ) |
| v. | ) No. 4:09-CV-14 CAS |
| LOWE'S HOME CENTERS, INC., et al., | ) ) ) |
| Defendants. | ) |

## MEMORANDUM AND ORDER

This matter is before the Court on defendants' motions to exclude the testimony of three of plaintiffs' expert witnesses. Defendant Lowe's Home Centers, Inc. ("Lowe's), The Quikrete Companies, Inc. ("Quikrete"), and The Valspar Corporation ("Valspar") move to exclude F. David Schneider, M.D., who is proffered to testify regarding medical symptoms caused by exposure to chemicals in Quikrete Multi-Surface Concrete Sealer ("the Sealer"), and Ernest Demba, who is proffered to testify regarding the value of the Metcalfs' home before and after application of the Sealer. Defendants Quikrete and Valspar also move to exclude Robert Bockserman, who is proffered to testify regarding properties of the Sealer and the adequacy of the Sealer's label. Defendants assert that the opinions of these experts do not meet the standards for admissibility set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). Plaintiffs oppose the motions. The parties have submitted an extensive evidentiary record, which includes deposition transcripts and videos, expert reports, and documents underlying the experts' opinions. Accordingly, the Court finds that it can make a proper Daubert analysis without the need for an evidentiary hearing or oral argument.

*Standard*

The admission of expert testimony in federal court is governed by Federal Rule of Evidence 702. Lauzon v. Senco Prods., Inc., 270 F.3d 681, 686 (8th Cir. 2001). "Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony." Weisgram v. Marley Co., 169 F.3d 514, 523 (8th Cir. 1999), aff'd, 528 U.S. 440 (2000). The Rule "favors admissibility if the testimony will assist the trier of fact." Clark v. Heidrick, 150 F.3d 912, 915 (8th Cir. 1998). Doubt regarding "whether an expert's testimony will be useful should generally be resolved in favor of admissibility." Id. (citation and internal quotation omitted).

In Daubert, the United States Supreme Court interpreted Rule 702 to require district courts to be certain that expert evidence based on scientific, technical or other specialized knowledge is "not only relevant, but reliable." Daubert, 509 U.S. at 589. The district court must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Daubert at 592-93.

The Eighth Circuit has explained that proposed expert testimony must meet three criteria to be admissible under Rule 702:

> First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact. This is the basic rule of relevancy. Second, the proposed witness must be qualified to assist the finder of fact. Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires . . . .
>
> The basis for the third prerequisite lies in the recent amendment of Rule 702, which adds the following language to the former rule: '(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and

methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.' Fed. R. Evid. 702.

Lauzon, 270 F.3d at 686 (internal citations and punctuation omitted).

The Daubert decision lists several nonexclusive factors a court may examine in performing its "gatekeeper" role of screening expert testimony for relevance and reliability. These are: "(1) whether the theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether the theory has been generally accepted." Lauzon, 270 F.3d at 686-87 (citing to Daubert at 93-94). Additional factors which have been developed in subsequent cases include "whether the expertise was developed for litigation or naturally flowed from the expert's research; whether the proposed expert ruled out other alternative explanations; and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case." Id. (citations omitted). The Daubert list of factors is not exclusive, and does not function as a definitive "checklist or test." Daubert, 509 U.S. at 593-94. Instead, the trial court retains great flexibility in customizing the analysis to fit the facts of each case. See Jaurequi v. Carter Mfg. Co., Inc., 173 F.3d 1076, 1083 (8th Cir. 1999).

*Background*

The factual background of this case has been set forth in earlier Memoranda and Orders and will not be repeated fully here. In brief, plaintiffs allege that they purchased the Sealer from a Lowe's store after a Lowe's employee told them that it was a suitable product to remove pet odor from the basement of their home. Plaintiffs applied the Sealer in their basement a few months after the purchase. During the application, plaintiffs allege they were overcome by fumes from the Sealer and forced to vacate their home. Six days after their exposure, plaintiffs went to see Dr. Sivasankara

3

Konala at an urgent care clinic. Nine weeks following their exposure, plaintiffs went to see Dr. Schneider, the chairman of the Department of Family and Community Medicine at St. Louis University. Kenneth Metcalf complained that at the time of the exposure, he experienced light headedness, and felt drunk and almost euphoric. He also had difficultly standing and walking, and his balance was impaired. According to Mr. Metcalf, these symptoms only improved after leaving the house. And since the time of the exposure he has felt pressure in his chest intermittently. Dr. Schneider's October 5, 2009 Letter at 2. Angela Metcalf reported to Dr. Schneider that at the time of exposure she also had light headedness, in addition to nausea, vertigo, swollen eyes, and she nearly passed out. She also complained of coughing. Mrs. Metcalf also reported that her symptoms only improved after leaving the house. She also reported to Dr. Schneider that at some point she returned to the house for 45 minutes and became numb and tingly. She also had difficulty standing, and since then has had crusty, irritated eyes, and she loses her balance more easily. Id. at 1. Dr. Schneider ordered a metabolic profile for both plaintiffs, but neither had their blood drawn. Dr. Schneider diagnosed plaintiffs with "Exposure to Toxic Chemical." Id.

Angela Metcalf complains in the Complaint that due to exposure to the Sealer she now suffers from "repeated light headedness, nausea, dizziness (vertigo), swollen eyes, coughing, fatigue, and headaches," as a result of the use of the Sealer inside her home. Plaintiffs' Amended Complaint at 4, ¶19. Mrs. Metcalf also alleges she suffers from sleeplessness, anxiety and stress "from these circumstances." Id. Plaintiffs also allege that the value of their home has been diminished, if not extinguished, and they have incurred remediation expenses, as well as the cost of obtaining alternative housing.

4

*Discussion*

A.     **David Schneider, M.D.**

Rule 26(a)(2) of the Federal Rules of Civil Procedures requires that parties must disclose the identity of any expert witnesses they may use at trial and the disclosure must be accompanied by a written report. The report is to contain, among other things, "a complete statement of all opinions the witness will express and the basis and reasons for them; and the data or other information considered by the witness in forming them." Rule 26(a)(2)(B)(I) and (ii).

Plaintiffs did not provide defendants a conventional expert report from Dr. Schneider. Instead, they disclosed a letter dated October 5, 2009, from Dr. Schneider to plaintiffs' counsel in which he provides answers to nine (9) questions apparently posed by plaintiffs' counsel. Upon review of the letter, the Court finds that not all of Dr. Schneider's responses to these questions amount to expert opinions. For example, Dr. Schneider was asked "[u]nder what circumstances and on what dates did the Metcalfs seek your medical care?" Dr. Schneider's response to this question is not an expert opinion. A treating physician such as Dr. Schneider can be deposed or called to testify at trial without being designated as an expert to the extent he or she testifies to the care and treatment of a patient. Turner v. Iowa Fire Equip. Co., 229 F.3d 1202, 1207 (8th Cir. 2000); Brown v. Best Foods, 169 F.R.D. 385, 387 (N.D. Ala. 1996); Zarecki v. National R.R. Passenger Corp., 914 F. Supp. 1566, 1572 (N.D. Ill. 1996); Salas v. United States, 165 F.R.D. 31, 33 (W.D.N.Y. 1995); Wreath v. United States, 161 F.R.D. 448, 449 (D. Kan. 1995). However, if the treating physician's opinion crosses over the line to causation and prognosis, he or she is subject to the provisions of Rule 26(a)(2)(B) and must meet the requirements of Rule 702. Turner, 229 F.3d at 1207 (8th Cir. 2000) ("a treating physician's expert opinion on causation is subject to the same standards of scientific reliability that

5

govern the expert opinions of physicians hired solely for the purpose of litigation."). See also Salas, 165 F.R.D. at 33.

The Court finds the following statements from Dr. Schneider's letter are subject to the requirements of Rule 702:

> Question: What is your medical opinion, if you have one, about whether the Metcalfs should return to live in their home?
>
> *Answer: Based on the fact that both Mr. and Mrs. Metcalf have returned to the home periodically and the smell causes immediate symptoms, I recommend that do not return to their home at this point.*
>
> Question: Do you have an opinion whether the symptoms and complaints made by the Metcalfs are being caused by the exposure to the chemicals in the concrete sealer they applied to their basement floor, and if so, what is that opinion?
>
> *Answer: I believe the symptoms experienced by the Metcalfs after the exposure were caused by exposure to Quikrete.*
>
> Do you have an opinion whether the Metcalfs should use or avoid personal items in their home, such as clothes, furniture, and other household items, if the items keep the fumes/odor from the chemical product, and if so, what is that opinion?
>
> *Answer: This is beyond my personal expertise, but if the items continue to emit fumes from the Quikrete, they should be avoided. I do not know if there is a safe way of cleaning the items to rid them of the toxin.[1]*

The first part of the Daubert analysis concerns whether the challenged testimony is reliable. To be reliable, the subject of the testimony must be "scientific . . . knowledge." Daubert, 509 U.S. at 590. "This requirement implies that the testimony must be grounded in the methods and procedures of science and must be more than unsupported speculation or subjective belief." Curtis

---

[1] In his deposition, Dr. Schnieder testified that it was his opinion that Angela Metcalf suffered from Multiple Chemical Sensitivity ("MCS"). The doctor admitted in his deposition, however, that he was not an expert on MCS, and plaintiffs have since agreed not to elicit testimony from Dr. Schneider regarding MCS. See Plaintiffs' Consolidated Opposition at 7.

v. M&S Petroleum, Inc., 174 F.3d 661, 668 (5th Cir. 1999) (citing Daubert, 509 U.S. at 590). A plaintiff in a toxic tort case claiming medical damages must prove that he or she was exposed to and injured by a harmful substance manufactured by the defendant. Wright v. Willamette Indus., Inc., 91 F.3d 1105, 1106 (8th Cir. 1996) (applying Arkansas law). "Scientific knowledge of the harmful level of exposure to a chemical, plus knowledge that plaintiff was exposed to such quantities, are minimal facts necessary to sustain the plaintiff's burden in a toxic tort case." Allen v. Pennsylvania Eng'g Corp., 102 F.3d 194, 199 (5th Cir. 1996); see Wright, 91 F.3d at 1106 (plaintiff must establish "the levels of exposure that are hazardous to human beings generally as well as the plaintiff's actual level of exposure to the defendant's toxic substance before he or she may recover.") A plaintiff, however, "need not produce a mathematically precise table equating levels of exposure with levels of harm in order to show that [he or] she was exposed to a toxic level" of a substance, but there must be sufficient evidence that the plaintiff was exposed to a quantity of the toxin that exceeded safe levels. Bonner v. ISP Technologies, Inc., 259 F.3d 924, 931 (8th Cir. 2001). See also Curtis, 174 F.3d at 671.

Like the court in Bonner, this Court believes it useful to separate Dr. Schneider's testimony regarding plaintiffs' acute symptoms, in other words those they suffered immediately after their exposure to the Sealer, from his opinions regarding the long-term effects of exposure and the safety of returning to the home. In regard to the acute symptoms, Dr. Schneider testified that he read the Material Safety Data Sheet ("MDS") for the Sealer, and it is his opinion that the symptoms Kenneth Metcalf reported shortly after exposure to the Sealer were caused by chemicals in the Sealer. He attributes this to the temporal proximity of the symptoms to the application of the Sealer in the basement. As for Angela Metcalf, Dr. Schneider testified that it is his opinion that the symptoms

7

Angela Metcalf reported she experienced shortly after exposure to the Sealer were caused by chemicals in the Sealer, and/or exposure to the Sealer triggered a panic attack. Dr. Schneider bases this opinion on the temporal proximity of the symptoms to exposure to the Sealer and Mrs. Metcalf's past medical history.

Defendants attack Dr. Schneider and his opinions on many grounds. They argue he failed to rule out other causes for their symptoms; that he has no basis for determining whether they were exposed to unsafe levels of the chemicals; that he could not identify which chemicals in the Sealer plaintiffs reacted to; and he was unqualified to testify regarding chemical exposure. The fact Dr. Schneider failed to make a differential diagnosis, that is rule out other causes, in regard to the acute symptoms the Metcalfs experienced shortly following exposure, does not render his opinion unreliable under Daubert. In regard to the symptoms the Metcalfs immediately experienced, there is less of a need to make a differential diagnosis. As the Eighth Circuit has pointed out, "[u]nder some circumstances, a strong temporal connection is powerful evidence of causation." Bonner, 259 F.3d at 931. See also Heller, 167 F.3d at 154 ("if a person were doused with chemical X and immediately thereafter developed symptom Y, the need for published literature showing a correlation between the two may be lessened"). Dr. Schneider read the MSDS, which states that the product, if inhaled, may cause respiratory tract irritation, headaches, drowsiness, or other effects to the central nervous system, essentially the same symptoms plaintiffs complained they experienced shortly after their exposure. He considered the immediacy of the symptoms following exposure, and based on this information and his experience and training as a medical doctor, he determined plaintiff's acute symptoms were caused by exposure to the Sealer. The Court finds that this "pass[es] Rule 702 muster." Bonner, 259 F.3d at 931.

8

The Court also finds unpersuasive defendants' argument that Dr. Schneider had no basis for determining whether the plaintiffs were exposed to sufficient doses of the chemicals to cause the acute symptoms they described. Plaintiffs need not provide the exact level of exposure; but rather they must show they were exposed to a quantity of the Sealer that exceeded safe levels Bonner, 259 F.3d at 931. Dr. Schneider was aware of the circumstances surrounding the application of the Sealer – that it was done in an unventilated basement – and there is evidence in the record to suggest plaintiffs were exposed to unsafe levels of the Sealer. Plaintiffs have evidence from defendants' representatives that the Sealer was not recommended for interior use; that application in an unventilated basement increases the likelihood of exposure to harmful fumes; and that the Metcalfs may have not been wearing the proper safety equipment for the conditions under which they were applying the Sealer. The fact that Dr. Schneider did not know the exact exposure levels may be the subject of cross-examination, but it is not fatal to the admissibility of his opinion regarding plaintiffs' acute symptoms. The Court also rejects defendants' argument that Dr. Schneider is not qualified to opine as to toxic exposure. The Court would agree that Dr. Schneider may not be an expert on Multiple Chemical Sensitivity, as he himself admitted in his deposition, but based on his curriculum vitae and the fact he is Chairman of the Department of Family and Community Medicine at St. Louis University, the Court finds he is qualified to testify regarding the causation of plaintiffs' immediate symptoms following exposure to the chemicals.

As to Dr. Schneider's opinions about plaintiff's long-term or permanent injuries, and the habitability of the Metcalf home and the safety of using their personal effects, the Court finds his opinions do not meet the reliability standards of Daubert. To the extent Dr. Schneider is offering an

9

opinion as to the long term effect of exposure to the Sealer,[2] the Court finds <u>Bland v. Verizon Wireless, L.L.C.</u>, 538 F.3d 893 (8th Cir. 2008) controlling and deems such an opinion would be inadmissable.[3] The Court concurs with the district court in <u>Bland</u> that as to long terms effects of chemical exposure, reliance on temporal proximity is not enough. And moreover, a medical opinion is likely to be not reliable under the <u>Daubert</u> standards if the expert failed to scientifically eliminate other possible causes for symptoms experienced long after exposure. <u>Id.</u> Dr. Schneider failed to eliminate other possible causes for symptoms may have had weeks after their exposure, and he conducted no testing.[4] This is simply not enough to meet the <u>Daubert</u> standard for reliability as to long-term or permanent symptoms arising from exposure to toxic chemicals. <u>Id.</u>

Dr. Schneider also opined about the safety of the Metcalfs returning to the home and using personal items that remained in their home. These opinions do not have an adequate scientific foundation to be reliable. Dr. Schneider had no basis of knowing, nine weeks after the application of the Sealer, whether there remained harmful levels of chemicals in the home or on the Metcalfs'

---

[2]In plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment, plaintiffs state, contrary to their amended complaint, that they "are not claiming a permanent disease or disability resulting from their exposure that would require expert testimony to link the hazardous chemicals to the medical condition . . . The Metcalfs are <u>not</u> claiming they have acquired a specific or permanent disease from their exposure that would require complex medical testimony . . ." Doc. 162 at 13.

[3]The Court notes that in <u>Bland</u>, the district court excluded the treating physician's opinion that the plaintiff suffered and would continue to suffer exercise-induced asthma as a result of exposure to freon. The plaintiff also reported that she experienced prolonged coughing immediately after ingesting freon. The opinion does not address whether the treating physician could testify as to whether ingestion of freon caused plaintiff's coughing, in other words, her acute symptoms.

[4]In his deposition, Dr. Scheinder state that he did conduct routine CBCs on the Metcalfs, but he stated in his deposition that his opinion was not based on the results of those tests. He also did a chest exam on Angela Metcalf and found her lung function to be normal.

personal items. He neither visited the home nor conducted environmental testing. Dr. Schneider's opinion as to habitability of the home was based on the Metcalfs telling him that they could not return to the home. As to whether they could use their personal effects, Dr. Schneider admitted "[t]his is beyond my personal expertise." And again this was based on the Metcalfs reporting that their personal items had absorbed fumes from the Sealer. These opinions do not meet the reliability standard of Daubert.

In sum, the only expert opinion Dr. Schneider's may offer at trial is the cause of plaintiff's acute symptoms which followed immediately after plaintiff's exposure to the Sealer. Other opinions he offered in his letter and deposition, such as long-term medical effects of exposure, the habitability of the Metcalfs' home and safety of using their personal items are inadmissible under Daubert. Dr. Schneider may also testify in his capacity as a treating physician as to his care, diagnosis, and treatment of the plaintiffs. Turner, 229 F.3d at 1207.

### B. Robert J. Bockserman

Defendants Valspar and Quikrete move to exclude the expert testimony of Robert J. Bockserman, who is the owner and president of Conatech Consulting Group, Inc., a consulting engineering firm. Mr. Bockserman has a Bachelor of Science and Master of Science, both in Agriculture from the University of Missouri at Columbia. In his expert report, which was attached to defendants' motion, Mr. Bockserman offers the following opinions:

- the Sealer has penetrated the concrete on plaintiffs' basement floor;

- the vapors emitted by the Sealer are likely to have penetrated other materials located in the house, including personal items such as clothing and furniture, and such items should be discarded;

11

- because of the high toxicity and dangerous chemical properties of the Sealer, it should not be used inside a building; and

- the Sealer is a misbranded hazardous substance, in that the label does not contain the proper warnings required by federal law, and it does not adequately warn that it should not be used in an interior environment.

The Court finds Mr. Bockserman's opinions that the Sealer has penetrated the plaintiffs' concrete floor and its vapors have been absorbed into the plaintiffs' personal items do not meet the reliability standards of Daubert. Mr. Bockserman did not obtain any samples and performed no testing on the home. Despite this, Mr. Bockserman testified in his deposition that fumes from the Sealer would "continue for . . . many, many months." He states in his deposition that he bases his opinion on the fact that he has "worked with polymers at Monsanto that have organic compounds in them, and it takes many, many months for all the solvents to come out." Bockserman Deposition at 155. This is not a reliable basis for this opinion. There is no indication that the Monsanto polymers contained the same chemicals or were even similar to the Sealer used in this case. Also, as he performed no testing, Mr. Bockserman cannot state whether the Sealer has indeed penetrated the concrete floor, whether fumes indeed did and/or do continue to linger, and whether they amount to toxic levels such that the house is not habitable or personal items cannot be used. Mr. Bockserman provides no indication as to what levels of the chemicals found in the Sealer would be hazardous to human health, and whether those levels were and are present in the Metcalfs' home and on their personal effects. In regard to the personal items, Mr. Bockserman admits in his deposition that items such as clothing would need to be tested to determine whether they remain contaminated with harmful fumes, which he did not do. Because Mr. Bockserman did not employ a reliable method to

form his opinion as to whether harmful fumes from the Sealer remained in the home and on the Metcalfs' personal effects, and if so, how long such fumes would continue to remain, his testimony regarding such matters will be excluded.

Mr. Bockserman also opines that the Sealer should never be used in the interior of a building. The basis for this opinion, however, is not from his expert report. Without explanation, he states in his report that due to "the high toxicity and dangerous chemical properties" of the Sealer, it should not be used indoors.[5] Mr. Bockserman does reference in his report and refer to in his deposition a study by the U.S. Department of Health and Human Services entitled "Interaction Profile for: Benzene, Toluene, Ethylbenzene and Xylene (BTEX)." He notes that the combination of Ethyl Benzene, Toluene, and/or Xylene in a single product enhances the effects with respect to the amount of the vapors that are inhaled.

The Court has reviewed this paper, which was attached to plaintiffs' supplemental response to the defendants' Daubert motions. The Court believes Mr. Bockserman's statement regarding the article may not be precise. Mr. Bockserman does not quantify the exposure levels under which the singular effects of the chemicals are enhanced when mixed. The article notes in its introduction that the profile is using a weight of the evidence qualitative approach to evaluate the influence of interactions in the overall toxicity of the mixtures, although "the Agency for Toxic Substances and Disease Registry (ATSDR) recognizes that observations of toxicological interactions depend greatly on exposure doses and that some interactions appear to have thresholds." Interaction Profile for:

---

[5]Mr. Bockserman also notes in his report and stated in his deposition that defendants' representatives have indicated that the Sealer was not intended for interior use. No expert opinion is necessary for the admission of statements made by the defendants' own representatives.

Benzene, Toluene, Ethylbenzene and Xylene (BTEX) at 1. The authors note that the approaches used in the article can be "used with specific exposure data from hazardous waste sites or other exposure scenarios." Id. More specially, as to the combination of toluene, ethylbenzene and xylene, the chemicals contained in the Sealer, the authors write that at some exposure levels the mixture of the chemicals did result in significantly higher blood concentrations of toluene, xylene, and ethylbenzne compared to the individual exposures, but at other exposure levels, the increase was negligible. Id. at 11, 13 and 47-8. Dr. Bockserman however, did not quantify the exposure levels of the mixture that were present in the Sealer. In sum, the Court finds reliance on this article is misplaced because as the article notes, its data are useful when employed with specific exposure data, which Mr. Bockserman did not have.

As for Mr. Bockserman's opinion regarding the inadequacy of the Sealer's warning label, the Court finds Mr. Bockserman is not an expert in the field of paint label warnings. Mr. Bockserman curriculum vitae reflects considerable expertise in product packaging, and in particular food packaging. It shows no similar expertise in warnings in the paint industry. See Adeyinka v. Yankee Fiber Control, Inc., 2009 WL 3154319 (S.D.N.Y. 2009); McCullock v. H.B. Fuller Co., 981 F.2d 656, 657 (2d Cir. 1992) (the witness's "training as an electrical and industrial engineer, along with his experience in the safety field, might qualify him to testify as to the need for a ventilation system, but that was not an issue in dispute. The adequacy of the warning labels was at issue, and [the witness] is not an expert in that field because he lacks training or experience in . . . the design of warning labels."). See also Early v. Toyota Motor Corp., 277 F. App'x 581, 585-86 (6th Cir. 2008).

While Mr. Bockserman did not design an alternative label and submit it to testing, he did make recommendations in his report and during his deposition as to what the Sealer's label should have

contained. However, the Court is suspect of some of these recommendations. For example, Mr. Bockserman opined that Federal Regulations required that the label of the Sealer contain the words "Danger,""Vapor Harmful," and "Poison," as well as the skull and cross bones signal, because the Sealer contains benzene. It appears to be undisputed, however, that the Sealer at issue in this case does not contain benzene, but ethylbenzene.

Because Mr. Bockserman is not an expert in the field of warnings and has done no testing as to what warnings would have been adequate in this case, and because the foundation of some of his opinions appear to be based on misinformation, the Court finds Mr. Bockserman's opinions as to the adequacy of the Sealer's label are not admissible under the standards of <u>Daubert</u>. The Court grants defendants Valspar and Quikrete's motion to exclude the testimony of Mr. Brockserman.

### C. Ernest Demba

Plaintiffs have proffered Ernest Demba to testify regarding the value of their residence before application of the Sealer and its value after the application. Mr. Demba is the managing member of Demba Valuation Services, LLC, a real estate appraisal company. In Mr. Demba's expert report, which was disclosed to defendants, he opines the Metcalfs' residence was worth $190,000.00 before the application of the Sealer and $0.00 after the Sealer was applied. Defendants do not object to the before application appraisal, but argue that the after-application appraisal of $0.00 does not meet the standards outlined in <u>Daubert</u>. The Court agrees.

Mr. Demba's opinion about the value of the residence following the application of the sealer is based on the following assumptions:

- that there is a volatile order emanating from the basement floor from a volatile sealer painted on it to seal off animal odors found throughout the floor;

- that the permeating odor has rendered the house unlivable;

- that the seal is permanent and cannot be remedied.

- that the vaporous condition of the residence is a health threat.

Mr. Demba further assumed "the inability to occupy the residence renders it unlivable and therefore without residential value. It is presumably to be demolished. That would include the whole basement, which floor is the source of the contamination." Demba Report at 54. Mr. Demba states in his report that "[t]he problem of a vaporous seal is considered unremediable, which would involve a fruitless attempt to remove the seal by using another vaporous solvent. Such an attempt only perpetuates the problem. The existing condition of vaporous seal permeating the air in the entire residence is considered unremediable. This constitutes a lethal threat to viability, utility and marketability of the residence." Id. at 54-55.

In preparing his report and forming his opinions, Mr. Demba did no inspection or tests for toxic or hazardous materials or conditions in or around the residence. He also admitted that he is not an expert on the field of environmental conditions or hazardous substances. Mr. Demba did enter the residence, but he did not wear protective equipment and was not aware of any smell in the house. Mr. Demba based his after-application valuation on a vacant lot with a gaping hole, because he made the assumption that the house would need to be torn down.

16

The Court finds that Mr. Demba's opinion regarding the value of the Metcalfs' home after the application of the sealer is inadmissible because it is irrelevant. Mr. Demba's opinion as to the after-application value of the home is based on assumptions for which there is no evidence in this case. There is nothing to suggest that the home is permanently uninhabitable and must be torn down. Mr. Demba cited to no medical or scientific experts to support his contention that the house is unlivable, and the Court finds no such evidence in the record. There is also no evidence in the record to support Mr. Demba's assumption that the house continues to emit a vaporous odor. He himself admits he detected no such smell when he visited the home. Because Mr. Demba's after-application valuation is based upon assumptions for which were is no factual support in the record, the Court finds Mr. Demba's opinion is irrelevant and would not assist the trier of fact in this case. His opinion concerning the residence's after-application valuation is inadmissible under Daubert.[6] Lauzon v. Senco Prods Inc., 270 F3d 681, 686 (8th Cir. 2001) ("evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue. This is the basic rule of relevancy.")

Accordingly,

**IT IS HEREBY ORDERED** that defendants Lowe's Home Centers, Inc.'s motion and The Quikrete Companies, Inc., and The Valspar Corporation's amended motion to exclude the expert testimony of F. David Schneider, M.D., are **GRANTED in part, and DENIED, in part.** Consistent

---

[6]In his deposition, Mr. Demba provided a new theory as to why the house was unmarketable. He offered the opinion that the home was unmarketable because plaintiffs would have to disclose to potential buyers that they used the Sealer in their home. Setting aside that this opinion was not disclosed in Mr. Demba's expert report, as required under Rule 26(a)(2), even this opinion is based on the assumption that there remains a hazardous condition in the home – an assumption for which there is no support in the record.

with the Court's Memorandum, the defendants' motions are **DENIED** to the extent that Dr. Schneider may testify regarding the causation of the acute symptoms plaintiffs experienced immediately after exposure to Quikrete Multi-Surface Concrete Sealer. He may also testify in his capacity as a treating physician. In all other respects, defendants' motions are **GRANTED.** [Docs. 132 and 141]

**IT IS FURTHER ORDERED** that defendants The Quikrete Companies, Inc., and The Valspar Corporation's motion to exclude the expert testimony of F. David Schneider, M.D. is **DENIED as moot.** [Doc. 136]

**IT IS FURTHER ORDERED** that defendants Lowe's Home Centers, Inc.'s, and The Quikrete Companies, Inc., and The Valspar Corporation's motions to exclude the export testimony of Ernest Demba regarding the after-application valuation of the Metcalf residence are **GRANTED.** [Docs. 134 and 137]

**IT IS FURTHER ORDERED** that defendants The Quikrete Companies, Inc., and The Valspar Corporation's motion to exclude the export testimony of Robert Bockserman is **GRANTED.** [Doc. 138]

                                **CHARLES A. SHAW**
                                **UNITED STATES DISTRICT JUDGE**

Dated this   26th   day of April, 2010.